1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SCOTT E. CONNER,                )    No. C 07-4965 MMC (PR)
                                )
            Plaintiff,          )    **ORDER GRANTING**
                                )    **DEFENDANTS' MOTION FOR**
    v.                          )    **SUMMARY JUDGMENT**
                                )
                                )    **(Docket No. 17)**
JAMES TILTON, et al.,           )
                                )
            Defendants.         )
_____ )

On September 26, 2007, plaintiff, a California prisoner incarcerated at Pelican Bay

State Prison ("PBSP") and proceeding pro se, filed the above-titled civil rights action under

42 U.S.C. § 1983, alleging he has been denied the right to practice his religion.  Thereafter,

the Court found plaintiff had stated cognizable claims under the First Amendment and the

Religious Land Use and Institutionalized Persons Act ("RLUIPA") against defendants PBSP

Chaplain J. Smith, Correctional Captain M. Foss, Associate Warden M.A. Cook and Warden

Horel, and California Department of Corrections and Rehabilitation ("CDCR") defendants

Director James Tilton and Chief Inmate Appeals Coordinator N. Grannis.  The Court directed

defendants to file a dispositive motion, or, alternatively, a notice that they were of the

opinion that plaintiff's claims could not be resolved by such a motion.  Now before the Court

is defendants' motion for summary judgment; plaintiff has opposed the motion and

United States District Court
For the Northern District of California

1  defendants have filed a reply.

2  **FACTUAL BACKGROUND**[1]

3  Plaintiff was at all times relevant to the complaint housed at PBSP.  (Compl. at 1.)

4  A.  Creativity

5  Plaintiff is an adherent of the system of beliefs known as Creativity and a member of

6  the associated organization known as the Creativity Movement.[2]  (Id. at 3-3a.)  Creativity is

7  dedicated to "the survival, expansion and advancement" of the white race.  (Decl. Scott

8  Conner, Supp. Opp. Mot. Summ. J. ("Conner Decl.") ¶ 18).)  Only white persons may

9  become members of the Creativity Movement.  (Compl. at 3c.)  In furtherance of its goals,

10  Creativity "uphold[s] the eternal laws of nature as the supreme ultimate authority and

11  reject[s] the orthodox beliefs in God, the afterlife, or any other supernatural 'being.'"

12  (Conner Decl. ¶ 18.)  Creativity's Golden Rule states: "What is good for the White Race is

13  the highest virtue; what is bad for the White Race is the ultimate sin."  (Id. ¶ 19; Ex. B at 2.)

14  The beliefs of Creativity are set forth in its "holy books": Nature's Eternal Religion,

15  The White Man's Bible and Salubrious Living.  (Conner Decl. ¶ 21.)  The Sixteen

16  Commandments of Creativity, found in both The White Man's Bible and Nature's Eternal

17  Religion, are as follows:

18  I.  It is the avowed duty and holy responsibility of each generation to assure and

19

20

21  [1] Unless otherwise noted, the facts set forth in the background section are not disputed by the parties.

22

23  [2] Plaintiff identifies himself as a member of World Church of the Creator
("WCOTC").  (Compl. at 3.)  In 2002, WCOTC lost a trademark-infringement lawsuit to
24  TE-TA-MA Truth Foundation-Family of URI, Inc., prohibiting WCOTC from continuing to
use the name World Church of the Creator.  TE-TA-MA Truth Foundation – Family of URI,
Inc. v. World Church of Creator, 297 F.3d 662 (7th Cir. 2002).  Defendants assert that
25  WCOTC subsequently changed its name to "Creativity."  (MSJ at 4.)  Plaintiff acknowledges
that "'World Church of the Creator' [is] also known as Creativity."  (Opp. at vi.)  Plaintiff
26  uses both WCOTC and "Creativity Movement" to denote the organization associated with
Creativity, and refers to adherents of Creativity as "Creators."  (Opp. at 1, 4-5, 12, 13;
27  Compl. at 3c.)  For consistency, the Court will refer in this order to plaintiff's alleged
religion as "Creativity," to the associated overarching organization as the "Creativity
28  Movement," and to Creativity's adherents as "Creators."

2

secure for all time the existence of the White Race upon the face of this planet.

II.  Be fruitful and multiply.  Do your part in helping to populate the world with your own kind.  It is our sacred goal to populate the lands of this earth with White people exclusively.

III.  Remember that the inferior colored races are our deadly enemies, and the most dangerous of all is the Jewish race.  It is our immediate objective to relentlessly expand the White Race, and keep shrinking our enemies.

IV.  The guiding principle of all your actions shall be:  What is best for the White Race?

V.  You shall keep your race pure.  Pollution of the White Race is a heinous crime against Nature and against your own race.

VI.  Your first loyalty belongs to the White Race.

VII.  Show preferential treatment in business dealings with members of your own race.  Phase out all dealings with Jews as soon as possible.  Do not employ niggers or other coloreds.  Have social contacts only with members of your own racial family.

VIII.  Destroy and banish all Jewish thought and influence from our society. Work hard to bring about a White world as soon as possible.

IX.  Work and creativity are our genius.  We regard work as a noble pursuit and our willingness to work a blessing to our race.

X.  Decide in early youth that during your lifetime you will make at least one major lasting contribution to the White Race.

XI.  Uphold the honor of your race at all times.

XII.  It is our duty and our privilege to further Nature's plan by striving towards the advancement and improvement of our future generations.

XIII.  You shall honor, protect and venerate the sanctity of the family unit, and hold it sacred.  It is the present link in the long golden chain of our White Race.

XIV.  Throughout your life you shall faithfully uphold our pivotal creed of Blood, Soil and Honor.  Practice it diligently, for it is the heart of our faith.

XV.  As a proud member of the White Race, think and act positively.  Be courageous, confident and aggressive.  Utilize constructively your creative ability.

XVI.  We, the Racial Comrades of the White Race, are determined to regain complete and unconditional control of our own destiny.

 (Compl. Ex. B at 4; Decl. Timothy J. McDonough in Supp. Mot. Summ. J. ("McDonough Decl.") Ex. E.)

B.    <u>Plaintiff's Requests for Religious Accommodation</u>

On November 8, 2006, plaintiff filed an inmate appeal claiming he was being denied the free exercise of his religion.  (Compl. Ex. A at 1.)  Specifically, he requested the following: (1) freedom for Creators at PBSP to practice their religion; (2) use of the chapel and reasonable time for Creativity group worship services; (3) access to religious adornments; (4) access to outside clergy of the Creativity Movement or a qualified inmate minister to conduct religious services; (5) a special religious diet; (6) the opportunity for Creator inmates to have marriage ceremonies performed by Creativity clergy; and (7) the right to receive and possess Creativity-related religious literature.  (<u>Id.</u> at 1, 3.)  With his appeal, plaintiff submitted "documents explaining the tenets of [his] religion."  (Compl. at 3.)  These documents consisted of four pages, including an introduction to Creativity, Three Short Rules of Salubrious Living, Fourteen Basic Points of Salubrious Living, and the Sixteen Commandments.  (Compl. Ex. B (Documents Explaining Creativity).)

Defendant Chaplain Smith denied plaintiff's appeal at the informal level, on the ground "the tenants [sic] of [plaintiff's] faith . . . put it in the category of a hate group" and "preclude individuals on the basis of their race."  (<u>Id.</u> at 1.)  Thereafter, defendants Captain Foss and Associate Warden Cook denied plaintiff's appeal at the first level of review, based on their conclusion that "[plaintiff's] religion promotes hatred, bigotry and racism which could lead to violence."  (<u>Id.</u> at 9.)  At the second level of review, defendant Warden Horel denied plaintiff's appeal, finding "[Creativity]'s ideology is such that it would tend to incite violence within the institutional setting . . . ."  (<u>Id.</u> at 10-11.)  Finally, defendant Chief Inmate Appeals Coordinator Grannis denied plaintiff's appeal at the Director's level, finding as follows:

> The DLR [Director's Level of Review] concurs that the appellant's religion of choice (world church of the creator) espouses values and commandments that are contrary to safe and secure institution operations.  The literature that the appellant presents, relative to the philosophies of his religion, are [sic] hateful and threatening to persons of other races and religions . . . . [T]he CDCR has a legitimate penological reason to limit the appellant's ability to practice this religion in a sanctioned setting . . . .  The appellant is free to follow whichever religion he chooses; however, the CDCR will not assist with formal practice of a religion that espouses violence and hatred of other religions and races.

4

(Id. at 12.)

**DISCUSSION**

A.    Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if, as to any given fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that

United States District Court
For the Northern District of California

fact.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

B.    Plaintiff's Claims

Plaintiff claims defendants have violated his right to the free exercise of his religion under the First Amendment and RLUIPA.  (Compl. at 3.)  Specifically, he claims defendants have denied him access to the following: (1) religious adornments; (2) inmate marriages performed by Creativity clergy; (3) group worship privileges; (4) Creativity clergy or a qualified inmate minister to conduct religious services; (5) religious literature; and (6) a religious diet.  (Id. at 3-3a.)  Plaintiff seeks an injunction ordering defendants to recognize Creativity as a religion and accommodate the religious practices listed above.

C.    Claims Against Defendant Tilton

Plaintiff brings his claims against several defendants, including a claim based on supervisorial liability against James Tilton ("Tilton"), the Director of the CDCR.  A supervisor may be held liable under 42 U.S.C. § 1983 upon either a showing of the supervisor's personal involvement in the constitutional deprivation or a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc). Consequently, a supervisor generally "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

Here, plaintiff has failed to allege facts or present evidence that defendant Tilton either knew of or personally participated in the denial of plaintiff's inmate appeals. Accordingly, as plaintiff has failed to establish any essential element of his claims with respect to defendant Tilton, summary judgment will be granted in such defendant's favor as to all of plaintiff's claims.

United States District Court
For the Northern District of California

D.     Unripe Claims

"The ripeness doctrine prevents courts, through avoidance of premature adjudication, from entanglement in theoretical or abstract disagreements that do not yet have a concrete impact on the parties." 18 Unnamed "John Smith" Prisoners v. Meese, 871 F.2d 881, 883 (9th Cir. 1989).  The ripeness inquiry contains both a constitutional and a prudential component.  Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).  The constitutional component of ripeness is often treated under the rubric of standing, and often "coincides squarely with standing's injury in fact prong." Id.  To satisfy the constitutional component there must exist a constitutional case or controversy; the issues must be "definite and concrete, not hypothetical or abstract." Id. at 1139 (internal quotation and citation omitted).  An alleged injury which is too imaginary or speculative will not support jurisdiction. Id.  In particular, an issue is not ripe for adjudication if it depends on "contingent future events that may not occur as anticipated, or indeed not occur at all." 18 Unnamed John Smith Prisoners, 871 F.2d at 883 (internal quotation and citation omitted).

1.     Marriage Performed by Creativity Clergy

Plaintiff claims defendants will not allow him to be married by clergy of the Creativity faith.  Defendants argue plaintiff has failed to present evidence that shows he requested and was denied the right to marry.

In support of his contentions, plaintiff has submitted a letter from a prison chaplain, acknowledging receipt of plaintiff's "request for marriage paperwork"; the letter, however, is dated November 15, 2008, almost fourteen months after plaintiff filed the instant action. (Conner Decl. Ex. BB.)  Moreover, the letter states: "[A]t this time the process is on hold [but] I want to assure you that you will be able to get married if you are legally able to get married." (Id.)  The letter further explains that the delay in processing is due to staffing and procedural issues unrelated to plaintiff, and assures plaintiff that "as soon as we kick the process in gear we will send you the necessary paperwork to get started." (Id.)  Indeed, plaintiff has submitted a copy of California Code of Regulations, title 15 ("CCR"), § 3216, which, consistent with the above correspondence, provides: "[I]nmate marriages shall be

7

permitted in accordance with the provisions of law and these regulations." (Compl. Ex. C.)

Plaintiff's evidence fails to show he has in fact requested and been denied the ability to marry. In particular, none of the responses to plaintiff's inmate appeals would support a finding that prison officials will deny a future request by plaintiff to be married by Creativity clergy.[3] Thus, plaintiff's asserted injury depends on "contingent future events that may not occur as anticipated, or indeed not occur at all." 18 Unnamed John Smith Prisoners, 871 F.2d at 883 (citation omitted). Accordingly, the Court finds plaintiff's denial of marriage claim is not ripe for review, and, consequently, is subject to dismissal without prejudice to plaintiff's raising such claim in a separate lawsuit should he sustain an actual injury.

### 2. Religious Adornments

Plaintiff claims defendants have denied him access to "religious adornments, pendants, medallions, etc." (Compl. at 3a.) In support of his claim, plaintiff submits a copy of CCR § 3213, which provides that inmate possession and use of any religious artifact is subject to approval by the institution head. (Compl. Ex. C.) Plaintiff fails to show, however, that he requested and was denied access to any specific religious items. In particular, the denial of plaintiff's inmate appeal at the Director's level of review states: "The appellant requested access to religious artifacts, but has not presented any specific requests (i.e. literature, artifacts, etc.); therefore, his requests for religious items will have to identify specific items." (Compl. Ex. A at 12.) Plaintiff has not presented evidence that shows he either resubmitted his appeal, or filed a new appeal, identifying the specific religious items to which he seeks access.

The decision as to whether a religious artifact may be permitted in the prison environment is highly fact-specific and not one that either prison officials or courts are equipped to make in the abstract. Given the above-discussed record, the Court finds plaintiff

---

[3] Plaintiff argues that because defendants have denied him access to Creativity clergy for the purpose of conducting group religious services, they also will deny him the opportunity to be married by Creativity clergy. Given the significant differences that exist in both the context and potential impact of religious services and marriage ceremonies, the Court disagrees.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  has failed to allege an actual injury.  Consequently, his claim is not ripe for review and will

2  be dismissed without prejudice to plaintiff's raising it in a separate lawsuit should he sustain

3  an actual injury.

4  E.      Free Exercise Claims

5       The First Amendment guarantees the right to the free exercise of religion.  Cruz v.

6  Beto, 405 U.S. 319, 323 (1972).  "The free exercise right, however, is necessarily limited by

7  the fact of incarceration, and may be curtailed in order to achieve legitimate correctional

8  goals or to maintain prison security."  O'Lone v. Shabazz, 482 U.S. 342, 348 (1987).

9  Consequently, in order to establish a free exercise violation, a prisoner must show a

10 defendant burdened the practice of his religion without any justification reasonably related to

11 legitimate penological interests.  See Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir.

12 2008).

13      1.      Definition of Religion

14       As an initial matter, defendants argue that plaintiff's beliefs are not religious in nature.

15 "Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its

16 terms, gives special protection to the exercise of religion."  Thomas v. Review Bd. of Indiana

17 Employment Sec. Division, 450 U.S. 707, 713 (1981).  In order to merit such protection,

18 plaintiff must present evidence that demonstrates (1) his beliefs are sincerely held, and (2) his

19 claims are rooted in religious belief, not in purely secular philosophical concerns.  See

20 Shakur, 514 F.3d at 884-85.  Here, there is no assertion that plaintiff's beliefs are not

21 sincerely held.  (Conner Decl. ¶ 17.)  Thus, the Court turns to defendants' argument that

22 Creativity does not qualify as a religion for purposes of the First Amendment.[4]

23 _____

24       [4] The Court has located no federal case that has decided the question of whether
   Creativity is a religion for purposes of the First Amendment.  One district court has found
25 Creativity qualifies as a religion in the context of an employment discrimination claim
   brought under Title VII of the Civil Rights Act of 1964.  See Peterson v. Wilmur Commc'ns,
26 Inc., 205 F. Supp.2d 1014, 1021-24 (E.D. Wis. 2002).  The standard applied to  determine
   whether a particular set of beliefs qualifies as a religion for purposes of Title VII, however, is
27 broader than that applicable in the context of the First Amendment.  See id. at 1017-18; see
   also Friedman v. S. Cal. Permanente Med. Group, 102 Cal. App. 4th 39, 58-59, 66 (2002),
28 cert. denied, 538 U.S. 1033 (2003) .

United States District Court
For the Northern District of California

The Supreme Court has carefully limited court inquiry into whether a particular set of beliefs is religious.  Importantly, a court may not question the validity or truth of a claimant's beliefs.  United States v. Seeger, 380 U.S. 163, 184-85 (1965).  "Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."  Thomas, 450 U.S. at 714.  Moreover, a court should not attempt to determine whether a claimant has correctly interpreted the teachings of his faith. See id. at 715-16 (holding, "it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow [believer] more correctly perceived the commands of their common faith").  Nor should a court "undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ."  Id. at 715.

A theistic system of beliefs is not an essential requirement of a religion.  See Torcaso v. Watkins, 367 U.S. 488, 495 (1961).  Further, a claimant need not be part of an organized religious sect or group in order for his beliefs to be considered religious.  Frazee v. Ill. Dep't of Empl. Sec., 489 U.S. 829, 834 (1989) ("[W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization . . . .").  Moreover, the beliefs of a claimant who is a member of such a sect or group need not be shared by all its members.  Thomas, 450 U.S. at 715-16.

The Supreme Court has not established a definitive test for determining whether a claimant's beliefs are religious in the First Amendment context.  Several federal appellate courts, however, including the Ninth Circuit, have adopted the test set forth by the Third Circuit in Africa v. Pennsylvania, 662 F.2d 1025 (3d Cir. 1981).[5]  In Africa, the plaintiff, a state prisoner and adherent of an organization known as MOVE, claimed the state's refusal to

---

[5]  See, e.g., Detmer v. Landon, 799 F.2d 929, 931 (4th Cir. 1986);  Wiggins v. Sargent, 753 F.2d 663, 666 (8th Cir. 1985 ); Alvarado v. City of San Jose, 94 F.3d 1223, 1229-30 (9th Cir. 1996) (applying Africa in context of First Amendment Establishment Clause claim); United States v. Meyers, 95 F.3d 1475, 1482-84 (10th Cir. 1996) (citing with approval district court's reliance on Africa) cf. United States v. Meyers, 95 F.3d 1475, 1482 (10th Cir. 1996) (applying Africa to plaintiff's Religious Freedom Restoration Act claim).

1    provide him with a religious diet violated his right to the free exercise of his religion.  Id. at

2    1025.  In analyzing the prisoner's claims, the Third Circuit identified three criteria to assist

3    courts in determining whether a set of beliefs is religious:

> First, a religion addresses fundamental and ultimate questions having to do
> with deep and imponderable matters. Second, a religion is comprehensive in
> nature; it consists of a belief-system as opposed to an isolated teaching. Third,
> a religion often can be recognized by the presence of certain formal and
> external signs.

7    Id. at 1032.

8        Additionally, the court explained:

> In considering a first amendment claim arising from a non-traditional
> "religious" belief or practice, the courts have looked to the familiar religions as
> models in order to ascertain, by comparison, whether the new set of ideas or
> beliefs is confronting the same concerns, or serving the same purposes, as
> unquestioned and accepted religions.  In essence, the modern analysis consists
> of a "definition by analogy" approach.  It is at once a refinement and an
> extension of the "parallel"-belief course first charged by the Supreme Court in
> [United States v. Seeger, 380 U.S. 163 (1965)].

14   Id. (internal parentheses, quotation and citation omitted).[6]

15       The Africa court concluded that MOVE, an organization based on a "preoccupation

16   with living in accord with the dictates of nature," id. at 1033, and lacking a comprehensive

17   set of beliefs or any organizational structure, did not qualify as a religion and, thus, prison

18   officials did not violate the plaintiff's First Amendment rights by denying him a raw-food

19   vegetarian diet.  Id. at 1036-37.

20       Here, as noted, defendants contend plaintiff's free exercise claim must fail because he

21   cannot show Creativity is a religion.  Specifically, defendants argue, Creativity is founded

22   solely on a racist, hate-based set of beliefs that serves no other purpose than to promote racial

23   segregation and violence.  In response, plaintiff has presented evidence that he claims

---

25       [6] Seeger concerned the interpretation of a statute that excused conscientious objectors
     from military service if their objection was rooted in religious belief.  See Seeger, 380 U.S. at
26   165.  The central issue was the definition of religious belief.  See id. at 165-166.  The
     Supreme Court held that in order for the statute to avoid violating the First Amendment, the
27   definition of religious belief included in the statute had to be construed to embrace all
     religions, not just traditionally recognized ones, id. at 165, and concluded that the beliefs of
28   three conscientious objectors were religious, even though those beliefs were not derived from
     or associated with any religious organization.  Id. at 166-69.

satisfies the criteria that serve to qualify Creativity as a religion under <u>Africa</u>.  The Court

now addresses the evidence presented by the parties with respect to each of the three prongs

of the <u>Africa</u> test.

<div align="center">a.      <u>Fundamental and Ultimate Questions</u></div>

As noted, under <u>Africa</u>, the hallmark of a religion is that it address "fundamental and

ultimate questions having to do with deep and imponderable matters."  <u>Id.</u> at 1032.   As

explained by the <u>Africa</u> court:

> Traditional religions consider and attempt to come to terms with what could
> best be described as "ultimate" questions – questions having to do with, among
> other things, life and death, right and wrong, and good and evil.  Not every
> tenet of an established theology need focus upon such elemental matters, of
> course; still, it is difficult to conceive of a religion that does not address these
> larger concerns.  For, above all else, religions are characterized by their
> adherence to and promotion of certain "underlying theories of man's nature or
> his place in the Universe."

<u>Id.</u> at 1033 (internal quotation and citation omitted).

Applying the above criteria to the facts before it, the Court of Appeals found MOVE

lacked such religious indicia for the following reasons:

> Save for its preoccupation for living in accord with the dictates of nature,
> MOVE makes no mention of, much less places an emphasis upon, what might
> be classified as a fundamental concern.  MOVE does not claim to be theistic:
> indeed it recognizes no Supreme Being and refers to no transcendental or all-
> controlling force.  Moreover, unlike other recognized religions, with which it is
> to be compared for first amendment purposes, MOVE does not appear to take a
> position with respect to matters of personal morality, human mortality, or the
> meaning and purpose of life.

<u>Id.</u>

In that regard, the <u>Africa</u> court found no implication of religion in what the plaintiff

had characterized as MOVE's "fundamental concern," specifically, "an all-consuming belief

in a 'natural' or 'generating' way of life – a way of life that ultimately cannot be reconciled

with 'civilization' itself."  <u>Id.</u>  Instead, as the <u>Africa</u> court observed:

> [Africa's] mindset seems to be far more the product of a secular philosophy
> than of a religious orientation.  His concerns appear personal (e.g., he contends
> that a raw food diet is "healthy" and that pollution and other such products are
> "hazardous") and social (e.g., he claims that MOVE is a "revolutionary"
> organization, "absolutely opposed to all that is wrong" and unable to accept
> existing regimes), rather than spiritual or other-worldly.  Indeed, if Africa's
> statements are deemed sufficient to describe a religion under the Constitution,

<div style="writing-mode: vertical-rl; text-align: center;">**United States District Court**<br>For the Northern District of California</div>

1

2

3

   it might well be necessary to extend first amendment protection to a host of individuals and organizations who espouse personal and secular ideologies, however much those ideologies appear dissimilar to traditional religious dogmas.

Id. at 1033-34.

   In concluding that MOVE's concerns were not analogous to the fundamental and ultimate concerns of traditional religions, the Third Circuit emphasized that "the free exercise clause does not protect all deeply held beliefs, however 'ultimate' their ends or all-consuming their means," and that although an "individual or group may adhere to and profess certain political, economic, or social doctrines, perhaps quite passionately," the first amendment "has not been construed, at least as yet, to shelter strongly-held ideologies of such a nature, however all-encompassing their scope." Id.

   Here, defendants argue, Creativity does not satisfy the first prong of the Africa test because it is based solely on the concept of white supremacy and, as the Third Circuit found with respect to MOVE, lacks a commitment to overarching principles analogous to those addressed by traditional religions. In opposition, plaintiff argues that Creativity differs significantly from organizations like MOVE because Creativity's overarching concern is to create a world of "balance and harmony" for its members through adherence to moral and physical codes of behavior. In particular, plaintiff maintains, Creativity addresses fundamental and imponderable matters dealing with life, death, right and wrong, and good and evil. In support thereof, plaintiff asserts:

   We truely [sic] believe in the Golden Rule of Creativity, which states, "What is good for the White Race is the highest virtue; what is bad for the White Race is the ultimate sin." The very root of this rule sprang from deep matters and issues concerning: that which promotes the life (existence) of the White Race, as right and good; that which promotes the Death (destruction/extinction) of the White Race as wrong and evil. These simple yet complex questions are predicated upon love and genuine concern for our own kind, and help us to identify those things which are healthy and beneficial to the well-being and best interests of the White Race and those things which are not. We further believe that all religions, philosophies, governments, customs, and practices that are contrary to the valid, proven, and substantiated laws of nature are false, unnatural, suicidal, and destructive; and must be abandoned for the betterment of mankind.

(Opp. at 6:19-7:10; Decl. of Scott E. Conner in Supp. Opp. Mot. Summ. J. ("Conner Decl.")

13

United States District Court
For the Northern District of California

1  ¶ 19.) (Emphasis in original.)

2      Additionally, as described by plaintiff, it is the belief of Creators that "only through

3  the all encompassing creed embodied in Creativity can we bring ourselves back into harmony

4  with nature and achieve our goal of a quality salubrious living, which is summed up by our

5  four-dimensional philosophy and phrase, 'A sound mind in a sound body in a sound society

6  in a sound environment.'"  (Conner Decl. ¶ 20) (emphasis in original).)

7      Specifically, plaintiff asserts, Creators intend to build a world in which the problems

8  of illness, superstition, racial tension, crime, overpopulation and poverty will not exist, and

9  will do so by achieving the following goals: (1) ensuring that the minds of Creators are free

10  from "sickness, disease, flaw, defect, error, unhealthy habits, false illogical reasoning and

11  superstition" (id. ¶ 20 at 11:25-28); (2) freeing the body of "harmful man-made chemicals

12  and drugs," eating a diet that is in accord with nature, and actively participating in activities

13  that promote fitness (id. ¶ 20 at 12:1-7); (3) "promoting companionship in our communities

14  that uphold these values, so that we are bound together by common interests and standards"

15  (id. ¶ 20 at 12:8-12); and (4) "ending all practices that are harmful to the environment," such

16  as pollution and deforestation, in order to "ensure that our next generation inherit a world that

17  is much cleaner and safer than we inherited from our parents . . . ."  (Id. ¶ 20 at 12:13-21.)

18

19      As noted, it is not disputed that plaintiff's beliefs are deeply held and serve as the

20  guiding principle for the way he aspires to lead his life.  Africa makes clear, however, that a

21  sincerely held "fundamental concern" does not necessarily equate with "fundamental and

22  ultimate questions having to do with deep and imponderable matters."  See Africa, 662 F.2d

23  at 1032.  By definition, imponderable matters are those that are "difficult or impossible to

24  assess," see Collins English Dictionary (6th Edition 2003), or "incapable of being weighed,

25  measured, or evaluated with exactness," see Webster's Third New International Dictionary

26  (1996).  As set forth below, the concerns underlying a particular belief system have, in many

27  instances, been found not to address such matters.

28      As one court applying Africa has written, most religions address concerns such as "a

14

fear of the unknown, the pain of loss, a sense of alienation, feelings of purposelessness, the inexplicability of the world, and the prospects of eternity." United States v. Meyers, 906 F. Supp. 1494, 1505 (D. Wyo. 1995); see id. (finding nothing "ultimate, profound, or imponderable" about belief system of Church of Marijuana, which had as its sole end smoking marijuana and had "nothing to say about profound and sublime issues such as man's sense of self, purpose in life, role in the world, existence in time, and being in space"). Another court has defined fundamental and ultimate religious beliefs as those that "flow out of, and embody a sense of relationship to a supreme or supernatural force which gives rise to duties superior to those arising from any human relation." Jacques v. Hilton, 569 F. Supp. 730, 733-34 (D.N.J. 1983) (internal quotation and citation omitted); (finding fundamental and ultimate concerns not addressed by ideology of Church of Saint Dennis, which recognizes existence of supernatural force and believes in performing good works and deeds but "do[es] not address the question of human mortality or the purpose of life at all"; distinguishing fundamental and ultimate beliefs as "giv[ing] rise to duties superior to those arising from any human relation"). Yet another court, in assessing whether the plaintiff's belief system addressed fundamental and ultimate concerns, considered whether the asserted religious beliefs speak to "the meaning of human existence; the purpose of life; theories of humankind's nature or its place in the universe; matters of human life and death; or the exercise of faith." Friedman v. S. Cal. Permanente Med. Group, 102 Cal. App. 4th 39,70 (2002), cert. denied, 538 U.S. 1033 (2003) (finding system of beliefs based on veganism, specifically, that "it is immoral and unethical for humans to kill and exploit animals even for food, clothing and the testing" did not address fundamental or ultimate questions, for the reason that it was limited to single subject of highly valuing animal life and did not speak to "the meaning of human existence; the purpose of life; theories of humankind's nature or its place in the universe; matters of human life and death; or the exercise of faith"); cf. Strayhorn v. Ethical Society of Austin, 100 S.W.3d 458, 470 (Tex. Ct. App. 2003) (finding Ethical Culture movement that rejected acceptance of belief in God or higher power as basis of religious experience nevertheless took religious approach to ultimate questions facing

United States District Court
For the Northern District of California

1   humankind by making "a commitment to attempt to discover, through observance and debate,

2   the transcendental moral truths that underlie human experience").

3        A system of beliefs need not be based solely on religious concerns in order to merit

4   First Amendment protection, however.  Rather, beliefs entitled to protection under the Free

5   Exercise Clause may be both secular and religious.  Callahan v. Woods, 658 F.2d 679, 684

6   (9th Cir. 1981).  In particular, as relevant here, even systems of belief that propound ideals of

7   racial segregation and/or supremacy may be entitled to First Amendment protection when

8   they are intertwined with, or stem from, religious beliefs.  See Wiggins v. Sargent, 753 F.2d

9   663, 667 (8th Cir. 1985) (remanding for further findings after rejecting district court's

10   conclusion that Church of Jesus Christ Christian's white supremacist belief system was

11   secular and, therefore, not religious; noting, "the fact that the notion of white supremacy may

12   be, and perhaps usually is, secular, in the sense that it is a racist idea, does not necessarily

13   preclude it from also being religious in nature, in the sense that it may be based upon a literal

14   interpretation of Biblical teachings."); see also Sutton v. Rasheed, 323 F.3d 236, 251-52 (3d.

15   Cir. 2003) (finding prisoners who were members of Nation of Islam and believed in

16   establishing racially segregated society for black people entitled to First Amendment

17   protection where beliefs based on teachings of Qur'an, Scriptures and Bible).

18        Beliefs that are based on "purely secular considerations," however, are not entitled to

19   the protections of the First Amendment, no matter how sincerely such beliefs are held.

20   Wisconsin v. Yoder, 406 U.S. 205, 215 (1977).  Consequently, concerns that are purely

21   personal or social do not satisfy the basic criteria for a religion.  See Africa, 662 F.2d at

22   1035, 1036 (finding MOVE's single, governing principle to live in "pure" and "natural"

23   environment secular in nature); Meyers, 906 F. Supp. at 1505 (holding Church of

24   Marijuana's beliefs in therapeutic, medical and social benefits of marijuana purely personal

25   and secular); Jacques, 569 F. Supp. at 734 (holding code of conduct espoused by Church of

26   Saint Dennis, to "let your conscience be your guide," reflected no more than belief in self-

27   determination that did not constitute religion); Friedman, 102 Cal. App. 4th at 70 (holding

28   plaintiff's sincere belief in tenets of veganism reflected moral and secular, rather than

**United States District Court**
For the Northern District of California

1   religious, philosophy).

2       Notably, a belief system that is secular in nature does not become a religion simply by

3   its use of religious terminology.  See, e.g., Kadans v. Riles, No. 82-5191 MRP(B), 1989 WL

4   146294, *2 (C.D. Cal. 1989) (finding teachings of Church of Universology, "while reciting

5   words like 'sacrament' and 'supreme being,' reflect[ed] no more than a pragmatic philosophy

6   that teaching of any kind is good" ).

7       Here, defendants' evidence that Creativity is a white supremacist organization does

8   not, standing alone, establish that Creativity does not also address fundamental and ultimate

9   issues.  Nevertheless, plaintiff has failed to present evidence from which a reasonable jury

10  could find Creativity meets the first prong of the Africa test.  Rather, as plaintiff's evidence

11  makes clear, Creativity's overarching concern is with a credo that addresses personal, social

12  and moral questions, as set forth in its ultimate goal of "a sound mind in a sound body in a

13  sound society in a sound environment" (see Conner Decl. ¶ 20), as well as in Creativity's

14  Sixteen Commandments, and, in particular, Commandment IV, which states: "The guiding

15  principle of all your actions shall be:  What is best for the White Race?"  (See Compl. Ex. B

16  at 4; Mcdonough Decl. Ex. E.)  Although the Sixteen Commandments also use such words as

17  "avowed duty," "holy responsibility," and "sacred goal" to describe Creativity's guiding

18  principles (see id.), such principles reflect no more than a pragmatic philosophy that Creators

19  must act to ensure the survival and promote the dominance of certain members of society.

20      Accordingly, based on such undisputed evidence, the Court concludes that

21  Creativity's belief system, like those of MOVE, the Church of Marijuana, the Church of

22  Saint Dennis, veganism, and the Church of Universology, is guided exclusively by secular

23  concerns.  Specifically, the end that Creativity seeks is a society that has been restructured

24  through white segregation, the attainment of which is not intertwined in any way with the

25  contemplation of "deep and imponderable" matters analogous to those with which traditional

26  religions are concerned.

27          b.    Comprehensive in Nature

28      The second prong of the Africa test asks whether the claimant's asserted religious

beliefs are "comprehensive" in nature.  <u>Africa</u>, 662 F.2d at 1035.  In particular, "[a] religion is not generally confined to one question or one moral teaching; it has a broader scope.  It lays claim to an ultimate and comprehensive 'truth.'"  <u>Id.</u>  To determine whether MOVE met such criterion, the <u>Africa</u> court compared MOVE to the Science of Creative Intelligence ("SCI"), a set of beliefs the Third Circuit had previously found to be a religion.  Reviewing its prior decision, the <u>Africa</u> court noted that SCI "consciously aimed at providing the answers to 'questions concerning the nature both of world and man, the underlying sustaining force of the universe, and the way to unlimited happiness,'" <u>id.</u> (citation omitted), and that MOVE, by contrast,  consisted of a "single governing idea," specifically, the "desire to live in a 'pure' and 'natural' environment."  <u>Id.</u>  Beyond such desire, the <u>Africa</u> court found, it was difficult to identify any comprehensive framework of beliefs to which MOVE's adherents could look for guidance.  <u>Id.</u>  The Third Circuit thus concluded that MOVE failed the second part of the <u>Africa</u> test.

Here, defendants argue that Creativity is not comprehensive in nature because it is limited to an isolated teaching of white supremacy.  In opposition, plaintiff argues that the evidence he has presented demonstrates Creativity consists of more than a single governing idea.  Specifically, plaintiff asserts, Creativity's Golden Rule and related teachings provide its followers with a standard for discerning right from wrong in the context of decisions related to an array of matters such as diet, mental health, work and family values.

In the instant case, a relationship exists between the criterion of comprehensiveness and the criterion of fundamental and ultimate questions.   In particular, while plaintiff's evidence shows that Creativity's doctrines address a wide range of concerns, the evidence also shows that the essence of Creativity is confined to "one question or one moral teaching" which, again, can be summed up by Creativity's Golden Rule: "What is good for the White Race is the highest virtue; what is bad for the White Race is the ultimate sin." (<u>See</u> Conner Decl. ¶ 19.)

Based on the undisputed evidence, the Court concludes that plaintiff's belief system, while governing his behavior in wide-ranging respects, is not sufficiently comprehensive to

1    meet the second <u>Africa</u> criterion.  <u>See</u> <u>Meyers</u>, 906 F. Supp. at 1506 (finding belief system of

2    Church of Marijuana not comprehensive where focus confined to growth, use, possession and

3    distribution of marijuana for personal therapeutic effect; distinguishing traditional religions

4    that use mind-altering plants "to attain a state of religious, spiritual, or revelatory

5    awareness."); <u>cf.</u> <u>Strayhorn</u>, 110 S.W.3d at 471 (finding belief system of Ethical Culture

6    focused on discovering truth through "experience of human interaction and ethical inquiry"

7    comprehensive because, "beyond simply asserting the primacy of a particular narrow idea or

8    assumption, Ethical Culture attempts to create a comprehensive response to the problems

9    faced in life based on a common contemplative practice").

10                        c.    <u>Formal and External Signs</u>

11             The third prong of the <u>Africa</u> test asks whether the claimant's belief system includes

12   formal characteristics analogous to those of traditional religions.  "Such signs might include

13   formal services, ceremonial functions, the existence of clergy, structure and organization,

14   efforts at propagation, observance of holidays and other similar manifestations associated

15   with the traditional religions."  <u>Africa</u>, 662 F.2d at 1035.  On the record before it, the <u>Africa</u>

16   court determined that MOVE did not meet the noted criteria because it had no formal

17   organization or structure, no scripture or catechism, no clearly defined clergy and no

18   religious holidays.  <u>Id.</u> at 1036.

19             Here, defendants argue, plaintiff has not presented evidence that Creativity includes

20   formal and external characteristics analogous to those of a traditional religion.  In opposition,

21   plaintiff argues the evidence shows that Creativity does in fact manifest such formal and

22   external signs.  Specifically, plaintiff has presented evidence that the Creativity Movement

23   has a well-defined organizational structure.  (Opp. Ex. P (Organizational Framework), Ex. Q

24   (Further Organizational Structure), Ex. R (Creator Prison Ministry Organization.)  In

25   particular, the Creativity Movement ordains clergy, who must be familiar with the teachings

26   of Creativity and must take an oath to follow and promote those teachings (Conner Decl.

27   ¶ 17); has formal group worship services  (Compl. at 3a; Conner Decl. ¶¶ 4, 33; Decl. J.

28   Sutherland, Supp. Opp. Mot. Summ. J. ("Sutherland Decl.") ¶¶ 19, 22); encourages its

1    members to promulgate its teachings and recruit new converts  (Conner Decl. ¶ 17; Opp. Ex.

2    Q (Further Organizational Structure)); and operates a prison ministry, whose mission is to

3    spread Creativity to incarcerated persons of the white race.  (Opp. Ex. R (Creator Prison

4    Ministry Organization), Ex. S (List of Materials Available from Creator Prison Ministry).)

5         Additionally, Creators conduct the following ceremonies: Oath Confirmation, Child-

6    Pledging Ceremony, Marriage, Saying of Goodbye, and Ordination of Ministers.  (Conner

7    Decl. ¶ 33; Sutherland Decl. ¶ 22.)  Creators also observe the following holidays: Klassen

8    Day (February 20th), Founding Day (February 21st), RAHOWA Day (March 10th), White

9    Mother's Day (second Sunday in May), White Father's Day (third Sunday in June), Parents'

10   Day (fourth Sunday in July), Martyr's Day (September 15th) and West Victory Day

11   (December 29th).  (Conner Decl. ¶ 33.)

12        While plaintiff has presented evidence that shows Creativity has formal and external

13   characteristics that might be considered similar to those associated with more traditional

14   religions, their sole purpose is to support what the Court already has found to be a secular

15   belief system.  Accordingly, the Court finds plaintiff's evidence fails to create a triable issue

16   with respect to whether such characteristics qualify Creativity is a religion.

17                   d.    Conclusion

18        Having applied the three criteria identified in Africa as a means of determining

19   whether a system of beliefs should be defined as religious for First Amendment purposes, the

20   Court concludes that plaintiff has failed to raise a genuine issue as to whether Creativity is a

21   religion.  First, the Court finds that to the extent Creativity deals with a fundamental concern,

22   such concern is with secular matters and not with religious principles.  Second, Creativity is

23   not comprehensive in nature because it is confined to one question or moral teaching.  Third,

24   the structural characteristics of Creativity do not serve to transform what are otherwise

25   secular teachings and ideals into a religious ideology.  Consequently, defendants are entitled

26   to summary judgment on plaintiff's First Amendment Claim.

27   F.    RLUIPA Claim

28        The Religious Land Use and Institutionalized Persons Act, RLUIPA, provides in

20

United States District Court
For the Northern District of California

relevant part:  "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . ., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a)(1)-(2).

Congress intended to distinguish RLUIPA from traditional First Amendment jurisprudence in at least two ways.  First, it expanded the reach of the protection to include "any religious exercise, including any exercise of religion, whether or not compelled by or central to, a system of religious belief."  Greene v. Solano County Jail, 513 F.3d 982, 986 (9th Cir. 2008) (internal quotations and citations omitted).  Second, in contrast to the deferential rational basis standard of Turner v. Safley, supra, RLUIPA requires the government to meet the much stricter burden of showing that the burden it imposes on religious exercise is "in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." Id. at 986 (internal quotation and citation omitted).  If prison officials meet this standard, the prison regulation passes muster under RLUIPA, regardless of the burden it imposes on religious exercise.  Id. at 989-90.  The plaintiff bears the burden of persuasion as to whether the regulation substantially burdens his exercise of religion and the state bears the burden of persuasion as to all other elements.  42 U.S.C. § 2000cc-2(b).

Relying on their argument with respect to plaintiff's First Amendment free exercise claim, defendants first argue that Creativity does not qualify as a religion under RLUIPA.  Under RLUIPA, "[t]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).  While RLUIPA bars inquiry into whether a particular belief or practice is central to a prisoner's religion, "the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."  Cutter v. Wilkinson, 544 U.S. 709, 725 n. 13 (2005) (citation omitted).  Consequently, under RLUIPA, as under the First Amendment, plaintiff has the initial burden of showing that his religious belief is sincere.  Vision Church v. Village of

Long Grove, 468 F.3d 975, 996-97 (7th Cir.2006).   In the instant case, although it is not disputed that plaintiff's beliefs are sincerely held, plaintiff's RLUIPA claim nonetheless fails. As one appellate court has noted: "Because RLUIPA is a guarantor of sincerely held religious beliefs, it may not be invoked simply to protect any 'way of life, however virtuous and admirable, . . . if it is based on purely secular considerations.'" Koger v. Bryan, 523 F.3d 789, 797-98 (7th Cir. 2008) (quoting Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)).

Here, as discussed above, this Court has found plaintiff's evidence insufficient to support a finding that his beliefs are based on anything other than "purely secular considerations." See id.  Accordingly, as plaintiff cannot meet his burden with respect to the issue of whether Creativity is a religion, defendants are entitled to summary judgment on plaintiff's RLUIPA claim.

G.    Plaintiff's Request for Injunctive Relief

Plaintiff has filed a motion by which plaintiff asks the Court to issue a temporary restraining order and preliminary injunction directing prison officials to return to him legal paperwork and religious materials that they confiscated, which items plaintiff states he needs to practice his religion and in order to proceed to trial.  In view of the Court's ruling granting defendants' motion for summary judgment, plaintiff's motion will be denied.

//
//
//
//
//
//
//
//
//
//

**United States District Court**
For the Northern District of California

**CONCLUSION**

For the reasons stated above, the Court orders as follows:

1.  Plaintiff's claims that he has been denied the right to marry and to have access to religious adornments are hereby DISMISSED without prejudice.

2.  Defendants' motion for summary judgment is hereby GRANTED in favor of all defendants with respect to plaintiff's First Amendment and RLUIPA claims alleging the denial of access to group worship, Creativity clergy and religious literature, and denial of a religious diet.

3.  Plaintiff's motion for injunctive relief is hereby DENIED.

This order terminates Docket Nos. 17 and 34.

The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: December 2, 2009

MAXINE M. CHESNEY
United States District Judge